**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In Re:

Precision Manufacturing Group, Inc.

    Debtor.

_____/

Case No:  26-01463
Chapter 11
Hon. James W. Boyd
Filed On: May 1, 2026

### DECLARATION OF SCOTT TILMA

I, Scott Tilma, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a shareholder and the CEO of Precision Manufacturing Group, Inc. ("**PMG**" or "**Debtor**").

2.      I own, through my 401(k) 195,000 shares of PMG's corporate shares.  The other 15,000 corporate shares are owned, through her 401(k), by my wife, Elizabeth Tilma ("**E. Tilma**") who is also PMG's CFO.

3.      As CEO, I am the primary officer in charge of PMG's day-to-day operations.

4.      As CFO, E. Tilma is the primary officer in charge of PMG's finances.

#### Background

5.      On January 3, 2019, PMG was incorporated under the laws of Michigan.

6.      On March 1, 2019 PMG purchased the assets of Precision Engineering & Manufacturing, Inc ("**PEM**"), which was owned by Arthur and Marcy Gajewski (jointly "**Gajewski**"), for $ 3,200,000.

7.      The purchase was funded through a loan from Byline Bank, seller financing, and capital contributions from E. Tilma and me.

8. PMG is a manufacturing company, which primarily produces steel, stainless steel, and aluminum parts for clients in the furniture, industrial construction, lighting, metal fabrication, and auto industry.

9. At the time PMG purchased PEM's assets, PMG was located at 16913 Power Dr., Michigan 49448 ("**Original Premises**").

10. After PMG acquired PEM's assets, PMG's sales grew substantially. By 2021, PMG had increased sales by more than 250% (approximately $1.265 million during the first 10 months of 2019 to approximately $3.602 million by year end 2021).

11. The increased sales required PMG to double the number of its employees and move from a 40-hour work week to three shifts plus overtime. PMG's Original Premises were inadequate to handle the increased sales. PMG needed to add additional equipment to effectively manufacture products under the increased sales volume.

12. To keep up with the growing business demands, in 2021 PMG implemented a strategic plan to increase its manufacturing capabilities. It relocated to a larger building located at 2176 E. Laketon Ave., Muskegon, Michigan 49442 ("**Operating Premises**") and purchased a Mazak Optiplex 3015 10k Fiber Laser ("**10k Laser**").

13. The new Operating Premises was purchased through an affiliated real estate holding company, Robyn's Nest Management, LLC ("**RNM**") that E. Tilma and I incorporated for the sole purpose of owning the Operating Premises.

14. In December of 2021, the 10k Laser was financed by ENGS for $799,590. The 10K Laser was installed in May of 2022.

15. However, within months of moving into the Operating Premises and prior to the 10K Laser being installed, PMG lost one of its largest customers, Appleton Manufacturing

("**Appleton**"), to an offshore supplier.  The loss of Appleton resulted in a loss of future sales estimated at $450,000.00 per year or more.

16.     From May of 2022 through March of 2023, PMG worked with the 10K Laser manufacturer but was never able to get the 10k Laser to perform correctly, which resulted in PMG having to redistribute workload back to its older 4k machines.

17.     In January of 2023, while PMG was still trying to replace the loss of Appleton, PMG lost a second large customer, Shiller, to an offshore supplier.  The loss of Schiller reduced PMG's sales by more than $650,000.00 per year.

18.     Fortunately, in March of 2023, PMG landed a large contract with UBT for $950,000.00 per year.

19.     During the Spring of 2023, PMG repeatedly contacted Mitsubishi HC Capital America ("**Mitsubishi**"), which had acquired ENGS, in an attempt to negotiate reduced payments on the loan for the 10K Laser while PMG waited for payments under the new UBT contract. Mitsubishi eventually agreed to six months of reduced payments.

20.     In September of 2023, after PMG invested approximately $500,000.00 into material and labor related to the new UBT contract, UBT lost its underlying government contract, which resulted in UBT cancelling its contract with PMG.  The loss of business from UBT's remaining contract resulted in PMG suffering a $350,000 deficit on the project.

21.     The loss of the capital PMG expended preparing for the UBT contract and the loss of anticipated income under the UBT contract forced PMG to layoff twelve of its employees, implement cuts to management's salaries, and ask Mitsubishi for a second agreement for reduced monthly payments.

22. Despite repeated attempts, Mitsubishi did not respond to the request for additional reduced monthly payments. Instead, in January of 2024, Mitsubishi sent a demand letter.

23. PMG continued to make sporadic payments to Mitsubishi but in August of 2024, Mitsubishi sent notice of its intent to file a lawsuit against PMG and seek repossession of the 10k Laser. PMG continued to request options to modify the payment terms to retain the 10k Laser. PMG also offered to buy out the lease for $500,000, which was rejected.

24. In October of 2024, PMG agreed to voluntarily surrender the 10K Laser based on PMG's understanding of comments made by Mitsubishi that by PMG voluntarily surrendering the 10K Laser Mitsubishi would be unlikely to pursue a deficiency.

25. In late 2024, Mitsubishi sold the 10K Laser for approximately $350,000.00, which was less than half of the purchase price, and, in my opinion, approximately $150,000.00 less than fair market value.

26. In January of 2025, Mitsubishi filed a lawsuit for the deficiency balance of approximately $405,000.00.

27. From February through October of 2025, PMG defended the lawsuit and attempted to negotiate with Mitsubishi; however, PMG's ability to offer a meaningful settlement was limited by reduced cash flow from two of its largest remaining customers moving from net 30-45 to net 60-90.

28. In November of 2025, rather than continuing to expend funds on litigation, PMG agreed to a consent judgment with a stay on collection while PMG reviewed options for settlement or reorganization.

29. Since losing UBT in September of 2023, E. Tilma and I have worked tirelessly on PMG's survival. We cut staff, reduced our salaries, infused capital into PMG, and placed liens on

has generally kept up with its financial obligations despite the loss of key customers, loss of the 10k Laser, increased operational costs from the 2021 expansion, and reduced 2025 cash flow from customers delaying payments of receivables.

30.    However, in February of 2026, Mitsubishi levied both PMG's bank accounts and our personal bank accounts, which was the proverbial "straw that broke the camel's back."

31.    In order to protect PMG's assets, continue operations, and retain employees, PMG made the hard decision to file for Chapter 11 bankruptcy.

32.    Prior to filing its Chapter 11 Petition, PMG contacted Byline Bank, which is PMG's largest creditor and first position secured claimholder, to review options to successfully reorganize its liabilities.

33.    Prior to filing its Petition, PMG and Byline were able to successfully negotiate terms for use of cash collateral.

34.    As explained in more detail herein, I anticipate that by reducing or eliminating PMG's financial obligations, including Mitsubishi's judgment, PMG can successfully reorganize and return to long term profitability.

### Financial Condition

35.    PMG's day-to-day finances are overseen by E. Tilma.  E. Tilma background includes over 30 years of financial leadership as CFO, Accounting Manager and CEO.  E. Tilma manages PMG's finances using Sage 50 software and manages payroll using ADP.

36.    PMG's year end financials and tax records are completed by Culver CPA Group.

37.    Based on the initial financial reports E. Tilma has complied for 2025, PMG generated total receipts of $3,256,363.00

38.    I reviewed PMG's assets in anticipation of its bankruptcy filing.  Based on my knowledge of PMG's assets I completed a spreadsheet with estimated values for PMG's equipment, furnishings, computers, software, and other personal property.  The estimated values are attached to PMG's Bankruptcy Petition as "Exhibit A."

39.    The aggregate value of PMG's assets on the Petition Date, including cash assets, receivables, equipment, vehicles, furnishings, and other personal property is estimated at $817,000.00.

40.    PMG's total liabilities at the Petition Date are estimated at approximately $3.5 million.  PMG's liabilities include aggregate first position secured debt to Byline of $2.25 million.  Bylines liabilities are comprised of four loans with Robyn's Nest as the co-borrower.  Byline's Loans are also secured by second mortgages on two pieces of real property owned by E. Tilma and me.   In addition, PMG's liabilities include a secured claim to the Small Business Administration estimated at $495,000.00; a secured claim to Gajewski for seller's financing estimated at $150,000.00; a judgment to Mitsubishi estimated at $444,930.00; and ordinary accounts payable estimated at $220,000.00.

41.    Based on the estimated liquidation value of PMG's assets and its estimated liabilities, if PMG liquidated its assets, then it appears that all proceeds from liquidation would be paid to Byline as the first priority secured creditor.

42.    I worked with E. Tilma to produce a cash flow projection, which is attached to PMG's Motion for Cash Collateral as "Exhibit A."

43.    Based on the cash flow projection, I believe that PMG, by reducing or eliminating ongoing payments to PMG's wholly unsecured creditors and payables, can operate at net neutral or net-positive while it seeks to reorganize under Chapter 11 of the United States Bankruptcy Code.

44.     In addition, I believe that with new customers, which have either recently retained PMG or I reasonably believe will retain PMG in the near future, PMG can successfully develop a plan of reorganization that will pay creditors more than they would receive in a liquidation and allow PMG to operate profitably after the reorganization.

### First Day Motions

45.     I have reviewed the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

46.     I believe that the relief sought in each of the First Day Motions: (i) is necessary to enable PMG to operate in its Chapter 11 with minimum disruption of its operations while it seeks to reorganize; (ii) is necessary to protect its Estate from loss in value; (iii) constitutes critical elements in achieving a successful restructuring process; and (iv) best serves its Estate and its creditors.

A.     Cash Collateral Motion

47.     Through its Cash Collateral Motion, PMG seeks Court approval to use cash collateral, including cash on hand, accounts, inventory, and receivables ("**Cash Collateral**").

48.     PMG has an immediate need for use of the Cash Collateral and will suffer irreparable harm if it is not immediately allowed to use Cash Collateral for operations, including, but not limited to, payment of utilities, insurance, employees, and vendors.

49.     I've personally reviewed the Cash Flow Projections attached to the Motion for Cash Collateral.  Based on my personal knowledge of PMG's operations, I believe that the estimates included are reasonable and feasible.

50.     Utilizing the Cash Collateral during its Chapter 11 proceeding will allow PMG to maintain its business operations while continually replenishing its Cash Collateral through its ongoing operations.

B.  Employee Wages Motion

51.     In the ordinary course of its operations, PMG incurs payroll obligations to its employees.  PMG's employs 22 full and part-time employees.

52.     PMG's payroll is approximately $22,500.00 every week.

53.     The amount of any pre-Petition compensation or benefits owed to an individual employee will not exceed $17,150.00 allowed as a priority claim under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

54.     All employee wages are current as of the Petition Date, provided however, that unpaid wages have accrued between the last payroll period and the Petition Date.

55.     PMG also provides certain employee benefits, including health insurance, vision insurance, dental insurance, and life insurance.

56.     PMG's employees rely on their employment income to pay necessary personal expenses.  If PMG delays a payroll distribution or benefit, then many of its employees may immediately leave for what they view as more secure employment.  Restaffing would be time-consuming and would result in substantial lost revenue.

C.  Utility Motion

57.     In the ordinary course of its operations, PMG incurs liabilities for utilities, including liabilities to Consumers Energy, DTE, Muskegon County Water & Sewer, Verizon Wireless, and Republic Services.

58.     All utilities, other the April invoice for Consumer's Energy, are current as of the Petition Date; provided however, that utilities have accrued between the last invoice and the Petition Date.

### Conclusion

59.     All the facts set forth in this declaration are based on: (i) my personal knowledge of PMG'S operations; (ii) upon information supplied to me by others parties related to PMG's history and operations; (iii) upon my review of relevant financial documents; (iv) my opinion based on my experience and knowledge of PMG's operation and financial condition; and (v) my opinion based on information and analysis provided to me by professionals, such as accountants, financial advisors, and attorneys.

60.     If I were called to testify, I could and would testify competently to the facts set forth herein.

I, Scott Tilma, declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Dated:  5/1/26                    By:  _____

Scott Tilma, as
Shareholder and CEO of Precision
Manufacturing Group, Inc.